☐ ORIGINAL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| USDC SDNY |
| DOCUMENT |
| ELECTRONICALLY FILED |
| DOC #: |
| DATE FILED: 7/9/20 |

**REALLY GOOD STUFF, LLC,**

Plaintiff,

- against -

19 Civ. 2218 (LLS)

**BAP INVESTORS, L.C. and CREATIVE
KIDS FAR EAST INC.,**

Defendants.

**SECOND AMENDED
OPINION & INJUNCTION**

On March 18, 2019, plaintiff Really Good Stuff, LLC ("RGS")
moved for an order preliminarily enjoining Defendants BAP
Investors, L.C. ("BAP") and Creative Kids Far East Inc.
("Creative Kids") from selling products bearing RGS's trademarks
or using its trademarks in any manner during the pendency of
this action.  RGS also moved to dismiss Defendants'
counterclaims for failure to state a claim upon which relief can
be granted.  Defendants cross-moved for a preliminary injunction
enjoining RGS from selling products bearing BAP's trademarks.

The Court's October 4, 2019 Opinion and Injunction granted
in part and denied in part RGS's motion for a preliminary
injunction and motion to dismiss counterclaims, and denied BAP's
cross-motion for a preliminary injunction.  On October 17, 2019,
the Court issued an Amended Opinion and Injunction, from which
defendants appealed on October 18, 2019.  On December 10, 2019,
the Court ordered RGS to post a bond in the amount of $600,000.

On June 1, 2020, the Second Circuit issued a summary order

-1-

affirming in part and vacating in part the Amended Opinion and Injunction, stating,

> We agree that the district court abused its discretion only with respect to the scope of the injunction, which barred Appellants "from selling any unit of any product that RGS sought to purchase . . . regardless of whether RGS sought to purchase some or all units from BAP's remaining inventory of that product." Special App'x at 34. We therefore vacate the preliminary injunction solely to the extent that it enjoins the sale of units (beyond the numbers RGS sought to purchase) of any product lines from which RGS sought to purchase less than all of the inventory, and remand for a reexamination of the proper scope of the injunction. We affirm the district court's judgment in all other respects.

In accordance with that order, this Court's Second Amended Opinion and Injunction is below.

## BACKGROUND

As of March of 2018, RGS owned the intellectual property of Steve Spangler Inc. ("SSI"), and had given to BAP the exclusive license to market that intellectual property under the parties' Second Amended Exclusive Licensing Agreement ("Licensing Agreement").

As an exclusive licensee, that prevented even the owner of the SSI intellectual property ("SSI IP") from marketing it. Since both BAP and RGS were in the business of marketing these items, they made an arrangement of which one would handle which products, and own the intellectual property. It is set forth in the March 30, 2018 Consent Letter in which the parties confirm that: the only products RGS can market are the Products listed on Exhibit A to the Consent Letter, and that RGS can promote,

use, sell, and distribute the Products on Exhibit A using the
SSI IP.

All rights to the packaging of the Products – other than
the SSI IP – are exclusively owned by BAP.  BAP can freely
market items that compete with the Products that do not use the
SSI IP.

After termination of the Licensing Agreement RGS can freely
make, use, and sell any item, including ones that compete with
the Products, as long as they do not use BAP's intellectual
property.

Thus, both RGS and BAP marketed the Products on Exhibit A,
RGS as its only products, and BAP as licensee of RGS, who
received a royalty on BAP's sales.  BAP could freely sell
competing products, and owned all rights to packaging, except
for SSI IP, which was reserved to RGS.  Reciprocally, RGS could
not use BAP's IP.

The Consent Letter incorporates their confirmation that
when the Licensing Agreement expired, RGS could freely market
competitive products, as long as they did not use BAP's IP.

### Expiration of Licensing Agreement

By its terms, the Licensing Agreement ended on December 31,
2018.  It provided:

> Purchase of Remaining Products: Upon the expiration of this
> Agreement's Term, the termination of this Agreement, or, in the
> event when a Product is discontinued pursuant to Paragraph 7.A,

> BAP will give SSI in writing the first and prior right to
> purchase the remaining copies of such Products at BAP's landed
> cost as shown on shipping invoices and manufacturing (factory)
> invoices, plus 15% or any lower price offered to any other
> parties. If SSI does not notify BAP of an intent to purchase
> such Products within the 10 business days following such offer,
> BAP may sell such Products to any third party. All such sales
> shall be subject to all Royalty payments provided herein.

Licensing Agreement ¶ 27.  As SSI's assignee, RGS had "the first and prior right to purchase the remaining copies of such Products . . . ."

BAP and Creative Kids (the majority shareholder of BAP) notified RGS of the remaining inventory available for RGS to purchase.  RGS sought to purchase all of the Insta-Snow 100 gram Jar, Insta-Snow 1 lb. Bag, Energy Stick, and Geyser Tube products; some of the Super Slime products; and other products not at issue in this case.  BAP did not sell to RGS any of the products RGS sought to purchase.

### BAP's Post-Expiration Uses of SSI Marks

Following the expiration of the Licensing Agreement term, BAP continued to use SSI marks in its advertising and promotional materials.  BAP's website includes the claims: "It all started when we discovered Insta-Snow in 2002" and "Today our product line has expanded and includes the Energy Stick, Geyser Tube, the wildly successful Sick! Science line . . . ." The website also displays the Energy Stick product, "Insta-Snow" word and design marks, "Sick Science" word and design marks, and

"Super Slime" word mark.

BAP and Creative Kids displayed SSI products at their booth in the 2019 New York Toy Fair, which featured Insta-Snow, Sick Science, and Super Slime products bearing their word and design marks.

BAP also sold non-SSI "Instant Amazing Snow" and "Super Slime" products in BAP's own designs.



SSI's "Insta-Snow" design mark



BAP's "Instant Amazing Snow" design mark



SSI's "Steve Spangler's Super Slime" design mark



BAP's "Super Slime" design mark

### The Parties' Claims

RGS claims that Defendants engaged in trademark infringement and unfair competition and breached the Licensing Agreement by (1) selling unapproved Insta-Snow products bearing the "Insta-Snow" and "Steve Spangler Science" word and design marks; (2) selling non-SSI products bearing the word mark "Super Slime" and an imitation of SSI's "Super Slime" design mark;

-5-

(3) selling non-SSI products bearing an "Instant Amazing Snow" design mark imitation of SSI's "Insta-Snow" design mark; (4) using the "Insta-Snow," "Super Slime," "Sick Science," "Energy Stick," and "Geyser Tube" marks after expiration of the Licensing Agreement in advertising materials; and (4) refusing to sell to RGS the products that it sought to purchase after the Licensing Agreement term expired.  Based on those claims, RGS seeks a preliminary injunction enjoining BAP and Creative Kids from

> (1) using in any manner, including in advertising and promotional materials, the word and/or design marks INSTA-SNOW, INSTANT AMAZING SNOW, STEVE SPANGLER SCIENCE, SUPER SLIME, STEVE SPANGLER'S SUPER SLIME, SICK SCIENCE, ENERGY STICK, and GEYSER TUBE; and (2) manufacturing, distributing, selling, or offering for sale, any products bearing any of the foregoing word and/or design marks.

BAP argues that the Consent Letter eliminated RGS's ownership rights to the "Super Slime" word and design marks and the "Insta-Snow" design mark, and that BAP owns those trademarks instead.  BAP counterclaims that RGS engaged in unfair competition by selling Insta-Snow and Super Slime products bearing BAP's design marks, and seeks a preliminary injunction enjoining RGS

> from selling its INSTA-SNOW and Steve Spangler's Super Slime products, and any similar products, in packaging that infringes Be Amazing Product's rights as defined in the Request for Consent to Assignment between Steve Spangler, Inc. and BAP Investors, L.C., dated March 30, 2018 (Exhibit 3 to the Declaration of Christopher Lisiewski), and for such further and other relief as the Court deems just and proper.

## DISCUSSION

### RGS's Motion for Preliminary Injunction

A party seeking a preliminary injunction must demonstrate "(1) irreparable harm and (2) either (a) a likelihood of success on the merits, or (b) sufficiently serious questions going to the merits of its claims to make them fair ground for litigation, plus a balance of the hardships tipping decidedly in favor of the moving party." Oneida Nation of New York v. Cuomo, 645 F.3d 154, 164 (2d Cir. 2011) (citation and internal quotation marks omitted). "Additionally, the moving party must show that a preliminary injunction is in the public interest." Id.

*A. Likelihood of Success on the Merits or Sufficiently Serious Questions Going to the Merits*

RGS contends that it is likely to succeed on the merits of its claims of trademark infringement, unfair competition, breach of contract, and breach of the implied covenant of good faith and fair dealing.

BAP makes three arguments explaining why RGS is not likely to succeed on its claims. First, BAP argues that it cannot be infringing RGS's trademarks because BAP owns the Insta-Snow design mark and the Super Slime word and design marks. Second, BAP argues that the "Insta-Snow" and "Super Slime" marks are not distinctive and thus not entitled to protection. Third, BAP

-7-

argues that even if the marks are protectable and RGS owns them, BAP is nonetheless authorized to continue selling products bearing the marks because RGS did not offer to purchase all the remaining products in BAP's inventory when the Licensing Agreement term expired.

1.

BAP first argues that it was granted ownership of the trademark rights to the "Super Slime" word mark and all SSI design marks, including the Insta-Snow and Super Slime design marks, under the Consent Letter.

The Licensing Agreement defines "SSI Trademarks" as:

> Collectively, (i) the phrases "Steve Spangler," "Steve Spangler Science," "created by Steve Spangler Science," "Insta-Snow," "Sick Science" and any design incorporating one of these phrases; and (ii) any words, phrases, and designs originated by SSI that have acquired distinctiveness primarily through the marketing efforts of SSI. "SSI Trademarks" do not include (i) the "Be Amazing" trademarks described as Purchased Assets, identified on Exhibit A to the Bill of Sale executed by SSI in favor of BAP on June 30, 2004, and any design incorporating the one of the phrases of such trademarks; and (ii) any words, phrases, and designs originated solely by BAP, or purchased by BAP from others including but not limited to Design for Today, Inc. that have acquired distinctiveness primarily through the marketing efforts of BAP.

Licensing Agreement ¶ 1(M). The phrases "Steve Spangler's Super Slime™," "Spangler Super Slime™," and "Super Slime™" were added to the SSI Trademarks definition by the Licensing Agreement Addendum. Licensing Agreement Addendum ¶ 4.

Under the "Consent Letter" in which BAP is named as "Company,"

-8-

For avoidance of doubt the SSI IP is defined as follows:
- SSI Patents consist of U.S. Patent Nos. 9,273,633; 8,550,379; and 7,971,801.
- SSI Trademarks consist of the following (1) Federal Registrations: SICK SCIENCE (Ser. No. 85/731,191), INSTA SNOW (Ser. No. 78/376,664); and (2) Common Law Trademarks: GEYSER TUBE, STEVE SPANGLER, STEVE SPANGLER SCIENCE, AND CREATED BY STEVE SPANGLER SCIENCE.
- SSI Copyrights: none.

Other than the SSI IP, all rights pertaining to the packaging of the Products including but not limited to all images, designs, instructions, instructional videos, inserts, trade dress, trademarks, markings, writings and works of authorship associated with the packaging of the Products, whether protectable or unprotectable by patent, trademark, copyright or otherwise, are exclusively owned by Company (the "Company IP").

Consent Letter at 2-3.

The Consent Letter's list of SSI Trademarks does not include most of the language in the Licensing Agreement Addendum's definition of SSI Trademarks, such as the "Steve Spangler's Super Slime™," "Spangler Super Slime™," and "Super Slime™" marks, or the language "any design incorporating one of these phrases." Therefore, BAP argues, the "Super Slime" word marks and all the design marks for "Sick Science," "Insta-Snow," "Steve Spangler Science," and "Steve Spangler's Super Slime" are no longer SSI Trademarks owned by RGS, but rather BAP's property.

BAP points to the Consent Letter's language that "If there is a conflict between this consent letter and the Agreement . . . the consent letter modifies the terms of the Agreement as set forth herein and the terms of the consent

letter will prevail."  However, the Consent Letter's lists of
SSI Patents, Trademarks, and Copyrights likely do not narrow the
broader, complete definitions of SSI Patents, Trademarks, and
Copyrights in the Licensing Agreement and Addendum.  This is
shown by the Consent Letter's direct reference to and
incorporation of the Licensing Agreement's definitions in the
statement, "Really Good Stuff is permitted to promote, use,
sell, and distribute the Products . . . using the SSI
Trademarks, SSI Patents and SSI Copyrights (as defined Sections
1M, 1L and 1A of the Agreement, respectively and herein (the
'SSI IP'))."  Consent Letter at 2.  Therefore, the Licensing
Agreement's language "and any design incorporating one of these
phrases" still applies, and RGS still owns the design marks of
the SSI Trademarks listed in the Consent Letter.

However, because the Consent Letter's list of SSI
Trademarks prevails over the specific trademarks listed in the
Licensing Agreement and Addendum, the Consent Letter's omissions
of the "Steve Spangler's Super Slime," "Spangler Super Slime,"
or "Super Slime" marks clarify "For avoidance of doubt" that
those marks are not SSI IP, and that BAP therefore owns them
instead.

2.

BAP also argues that "Insta-Snow" and "Super Slime" are not
protectable marks because they are generic.

-10-

"Courts assess inherent distinctiveness by classifying a mark in one of four categories arranged in increasing order of inherent distinctiveness: (a) generic, (b) descriptive, (c) suggestive, or (d) fanciful or arbitrary." Brennan's, Inc. v. Brennan's Restaurant, LLC, 360 F.3d 125, 131 (2d Cir. 2004). "Generic marks are those consisting of words identifying the relevant category of goods or services." Star Indus., Inc. v. Bacardi & Co., 412 F.3d 373, 385 (2d Cir. 2005). "Descriptive marks are those consisting of words identifying qualities of the product." Id. "Suggestive marks are those that are not directly descriptive, but do suggest a quality or qualities of the product, through the use of imagination, thought and perception." Id. (citations and internal quotation marks omitted). "Arbitrary or fanciful marks are ones that do not communicate any information about the product either directly or by suggestion." Id. "Marks that are arbitrary, fanciful, or suggestive are considered 'inherently distinctive,' and are automatically entitled to protection under the Lanham Act." Genesee Brewing Co. v. Stroh Brewing Co., 124 F.3d 137, 143 (2d Cir. 1997).

"If a mark has been registered with the United States Patent and Trademark Office, the defendants in an infringement action do bear the burden of overcoming the presumption that the mark is not generic." Reese Pub. Co. v. Hampton Int'l Commc'ns,

-11-

Inc., 620 F.2d 7, 11 (2d Cir. 1980).  The "Insta-Snow" word mark
was registered with the USPTO on March 1, 2005, and BAP fails to
meet its burden.  The term "Insta-Snow" does not identify the
product as a children's educational toy.  Although BAP points
out that the phrase "instant snow" is becoming increasingly
well-known as the powder product made to resemble snow, that
does not render the separate term "Insta-Snow" generic.  See
Genesee, 124 F.3d at 144 (a "mark is not generic merely because
it has some significance to the public as an indication of the
nature or class of an article.  In order to become generic the
principal significance of the word must be its indication of the
nature or class of an article, rather than an indication of its
origin") (citation and internal quotation marks omitted)
(emphases in original).

    The mark is also not descriptive of the product's qualities
because Insta-Snow is not made up of real snow but a plastic
polymer in powder form that expands to turn into a snow-like
substance when water is added.  Rather, the mark is suggestive
as it suggests a product with snow-like qualities, and is
distinctive.

    "Super Slime" is not generic, either.  Although the word
"slime" is a generic term known to the public as a soft and
slippery substance, the "Super Slime" mark does not have the
principal significance of identifying the product to the public

as a science slime toy product.  Cf. Loctite Corp. v. Nat'l
Starch & Chem. Corp., 516 F. Supp. 190, 203 (S.D.N.Y. 1981)
(finding the term "Super Glue" to be generic because its
principal significance "to the relevant public is that of a
designation of a kind of glue which is rapid setting and strong
bonding," as "Contemporaneous press releases and articles show
generic use of the term," such as "Super-Glue Disappearing" and
"Hazards in Superglue Reported; Sales Halted").

Instead, the "Super Slime" mark is either descriptive or
suggestive.  "The majority view is that self-laudatory terms
such as 'Best,' 'Supreme,' 'Quality,' "Premier,' 'Exquisite,'
'Famous,' and so on, are descriptive and thus entitled to no
trademark protection absent secondary meaning."  Classic Liquor
Importers, Ltd. v. Spirits Int'l B.V., 201 F. Supp. 3d 428, 443-
44 (S.D.N.Y. 2016).

> Nonetheless, there is conflicting authority as to the
> classification of self-laudatory marks in the Second Circuit.
> Most cases indicate such marks are descriptive. See Murphy v.
> Provident Mut. Life. Ins. Co. of Phila., 923 F.2d 923, 927 (2d
> Cir. 1990) ("Marks that are laudatory and that describe the
> alleged qualities or characteristics of a product or service are
> descriptive marks."); Supreme Wine Co. v. Am. Distilling Co.,
> 310 F.2d 888, 890 (2d Cir. 1962) ("[L]audatory epithets are
> normally available to all the world, and are not entitled to
> trademark protection."); PaperCutter, Inc. v. Fay's Drug Co.,
> 900 F.2d 558, 563 (2d Cir. 1990) (noting that terms "indicating
> the . . . merits of a product" are descriptive). But a relatively
> more recent case suggests they may be suggestive. See Estee
> Lauder Inc. v. The Gap, Inc., 108 F.3d 1503, 1509 (2d Cir. 1997)
> ("A term that is merely self-laudatory, such as 'plus' or
> 'super,' seeking to convey the impression that a product is
> excellent or of especially high quality, is generally deemed
> suggestive."). In the face of this mixed guidance, district

> courts in the Second Circuit have made case-by-case
> determinations as to whether a particular laudatory term as used
> in context is "descriptive" or "suggestive." <u>See, e.g.,</u> <u>Alpha
> Recycling, Inc. v. Crosby</u>, 2016 WL 1178774, at *5 (S.D.N.Y. Mar.
> 23, 2016) (finding the term "Alpha" to be suggestive when used
> in reference to recycling services.)

<u>Id.</u> at 444.

Following the majority view, the self-laudatory term
"Super" is more likely descriptive than suggestive, especially
when combined with the generic term "Slime." "A descriptive
mark is entitled to protection upon proof that it has obtained a
secondary meaning, that is to say, an identity that consumers
associate with a single source, even though the source itself
may be unknown." <u>Gruner + Jahr USA Pub., a Div. of Gruner +
Jahr Printing & Pub. Co. v. Meredith Corp.</u>, 991 F.2d 1072, 1076
(2d Cir. 1993). Neither party demonstrates that "Super Slime"
has obtained secondary meaning. Thus, although BAP owns the
"Super Slime" mark under the Consent Letter, the mark is so
likely not entitled to protection that its marketing will not be
preliminarily enjoined.

3.

BAP further argues that even if the marks are protectable
and RGS owns them, BAP is nonetheless authorized to continue
selling products bearing the marks after the expiration of the
Licensing Agreement term. BAP claims that the Licensing
Agreement provision giving RGS "the first and prior right to

-14-

purchase the remaining copies of such Products" at the expiration of the term required RGS to purchase all or none of the remaining products in BAP's inventory.  Licensing Agreement ¶ 27.  RGS only sought to purchase some, not all, of the products in BAP's possession.  Therefore, BAP argues, it was not required to sell any products to RGS and could sell them to third parties.

The language in the Licensing Agreement is ambiguous.  It does not specify that RGS has the right to purchase "any" or "some" of the remaining products, nor does it specify that RGS must purchase "all" the remaining products in BAP's inventory.

BAP argues that the use of the word "the" in "the remaining copies of such Products" means "all."  However, "BAP will give SSI in writing the first and prior right to purchase the remaining copies of such Products" merely means that RGS has the option to purchase all the products, not that it must.  The following sentence "If SSI does not notify BAP of an intent to purchase such Products . . . BAP may sell such Products to any third party" does not include the word "the" or any other language indicating that RGS is required to buy either all or none of the products.

The ambiguity of the language is clarified by the parties' course of performance during the Licensing Agreement term. RGS's first and prior right to purchase the remaining products

also applied "in the event when a Product is discontinued."  On
four separate occasions during the term when an SSI product was
discontinued, SSI exercised its right and purchased some units
of the discontinued product remaining in BAP's inventory, but
not all of them.  Second Brooks Decl. ¶ 132.  See KN Energy,
Inc. v. Great W. Sugar Co., 698 P.2d 769, 779 (Colo. 1985) ("The
parties' course of performance following execution of the
contract" is "relevant to the interpretation of the agreement,"
and "may be used as an aid to interpretation whenever one party
accepts repeated performance by the other party with knowledge
of the nature of that performance and an opportunity to object
to it.").[1]

RGS has thus established a likelihood of success on the
merits of its claim that it was not required to purchase all the
remaining products and that BAP's post-expiration sales of
products that RGS sought to purchase are unauthorized, or has at
least raised sufficiently serious questions going to the merits
to make them fair ground for litigation.

BAP also argues that RGS's notification of intent to
purchase the products was untimely.  BAP gave RGS written notice
of the inventory available for purchase on January 1, 2019.
Under the Licensing Agreement, RGS was required to notify BAP of

---

[1] The parties agree that Colorado contract law governs the Licensing Agreement
and Consent Letter.

its intent to purchase within ten business days, or by January 15, 2019.  However, BAP's January 1, 2019 letter specified that its offer "is good through January 19, 2018, at which time said offer will expire."[2]  RGS's notification of its intent to purchase some products in its January 17, 2019 letter was thus timely.

4.

The next inquiry is whether BAP's use of RGS's marks is likely to cause consumer confusion.

> When an ex-licensee continues to use a mark after its license expires, likelihood of confusion is established as a matter of law. Ryan v. Volpone Stamp. Co., 107 F. Supp. 2d 369, 399 (S.D.N.Y. 2000); see also Bowmar Instrument Corp. v. Continental Microsystems, Inc., 497 F. Supp. 947, 959 (S.D.N.Y. 1980) (holding that continued use of a mark after termination of a license constitutes trademark infringement).  In such situations, confusion is almost inevitable because consumers have already associated the formerly licensed infringer with the trademark owner.

L & L Wings, Inc. v. Marco-Destin, Inc., 676 F. Supp. 2d 179, 188 (S.D.N.Y. 2009).

Because BAP is a previous licensee that continues to use RGS's marks after the termination of the Licensing Agreement, it is established as a matter of law that BAP's sales of unapproved Insta-Snow products bearing RGS's "Insta-Snow" and "Steve Spangler Science" word and design marks and use of the "Insta-Snow," "Sick Science," "Energy Stick," and "Geyser Tube" marks

---

[2] Because BAP's letter is dated January 1, 2019, the "January 19, 2018" expiration date was most likely intended to be "January 19, 2019."

in advertising and promotional materials are likely to cause consumer confusion.

BAP's own "Instant Amazing Snow" word and design marks, however, are not the exact same marks as RGS's "Insta-Snow" marks, and likelihood of confusion is not established as a matter of law.  Rather, the determination of likelihood of confusion is based upon the multi-factor balancing test set forth in Polaroid Corp. v. Polarad Elecs. Corp., 287 F.2d 492, 495 (2d Cir. 1961):

> Where the products are different, the prior owner's chance of success is a function of many variables: the strength of his mark, the degree of similarity between the two marks, the proximity of the products, the likelihood that the prior owner will bridge the gap, actual confusion, and the reciprocal of defendant's good faith in adopting its own mark, the quality of defendant's product, and the sophistication of the buyers.

Although there is no evidence regarding actual consumer confusion, the inferiority of the Instant Amazing Snow product, or the sophistication of consumers, most of the other Polaroid factors weigh in favor of finding a likelihood of consumer confusion.

The strength of the "Insta-Snow" mark is shown through its association with SSI products since 2002 and its word mark registration with the USPTO since 2005.  As previously discussed, the mark is suggestive and distinctive.

The word mark "Instant Amazing Snow" differs in that it spells out the entire word "Instant" and adds the word

-18-

"Amazing."  However, the design mark is highly similar to RGS's
mark, as it uses the same font, colors, and spacing.  The main
difference between the designs is that Instant Amazing Snow does
not include a small white snowflake in the center.

The proximity of the products is extremely close as they
are the same type of powder toy made to resemble snow and will
undoubtedly compete against each other.  Because of that
competitive proximity, there is no gap for RGS to bridge.  See
Star Indus., 412 F.3d at 387 (holding that when "products are
already in competitive proximity, there is really no gap to
bridge, and this factor is irrelevant to the Polaroid analysis
in this case.").

BAP's lack of good faith can be inferred because it used to
be the licensee of RGS's marks and adopted almost exactly the
same design mark.  It is likely that BAP hopes to gain from
SSI's reputation and goodwill that RGS now owns.

RGS is therefore likely to succeed on the merits, or has
raised sufficiently serious questions going to the merits, of
its trademark infringement, unfair competition, and breach of
contract claims, with the exception of the "Super Slime" marks.

There is no need to address RGS's claim of breach of
implied covenant of good faith and fair dealing.  See Eve of
Milady v. Impression Bridal, Inc., 957 F. Supp. 484, 487
(S.D.N.Y. 1997) ("Where a plaintiff seeks a preliminary

-19-

injunction and asserts multiple claims upon which the relief may
be granted, the plaintiff need only establish a likelihood of
success on the merits on one of the claims.").

*B. Irreparable Harm*

"Any party seeking a preliminary injunction 'must
demonstrate that it will suffer irreparable harm in the absence
of the requested relief.'" Sussman v. Crawford, 488 F.3d 136,
140 (2d Cir. 2007) (quoting Latino Officers Ass'n v. Safir, 170
F.3d 167, 171 (2d Cir. 1999)). Irreparable harm is "harm that
(a) occurs to the parties' legal interests and (b) cannot be
remedied after a final adjudication, whether by damages or a
permanent injunction." Salinger v. Colting, 607 F.3d 68, 81 (2d
Cir. 2010).

"Irreparable harm 'exists in a trademark case when the
party seeking the injunction shows that it will lose control
over the reputation of its trademark pending trial,' because
loss of control over one's reputation is neither 'calculable nor
precisely compensable.'" New York City Triathlon, LLC v. NYC
Triathlon Club, Inc., 704 F. Supp. 2d 305, 343 (S.D.N.Y. 2010)
(quoting Power Test Petroleum Distribs., Inc. v. Calcu Gas,
Inc., 754 F.2d 91, 95 (2d Cir. 1985)).

SSI invested time and effort into developing its products
and marks. It used some of its earliest word and design marks,

-20-

"Steve Spangler Science" and "Insta-Snow," since 1991 and 2002, respectively. As the current owner of those trademarks, RGS will suffer the irreparable harm of losing control over the reputation and goodwill that Steve Spangler Science products have gained if BAP is not enjoined from using those marks, or confusingly similar imitations of the marks, when selling and advertising products. That harm is especially great given that some of BAP's unapproved Insta-Snow products do not perform to requisite quality standards, as they do not expand to the same size and density as those of the approved Insta-Snow products. Second Brooks Decl. ¶¶ 68-72. That loss of goodwill is not calculable and cannot be remedied by royalty payments or other monetary damages.

BAP argues that RGS faces no irreparable harm from BAP's post-expiration sales because BAP is authorized under the Licensing Agreement to continue selling competing SSI products that RGS did not offer to purchase. BAP states that if RGS wanted to maintain control over its products, RGS could have purchased BAP's entire remaining inventory. However, as discussed, RGS was likely not required to purchase the entire inventory. RGS sought to purchase all the remaining Insta-Snow, Energy Stick, and Geyser Tube products that it wanted to sell

after expiration of the term.[3]  If BAP had honored RGS's first and prior right to purchase those products, BAP would not be able to sell any competing Insta-Snow, Energy Stick, or Geyser Tube products.

## C. Balance of Hardships and the Public Interest

RGS's hardships outweigh those of Defendants.  RGS faces the continued irreparable harm of loss of goodwill and control over its reputation absent injunctive relief.

In contrast, Defendants would be prevented from using RGS's word and design marks (that they do not own or have a license to use) and confusingly similar imitations of those marks on their unapproved products and advertising materials.  They would also be prevented from selling products that they were required to sell to RGS at the expiration of the Licensing Agreement term.

Defendants' businesses would not be severely impacted, as they would still be able to sell other products bearing non-infringing marks.  Defendants would also still be able to sell the SSI products that RGS did not offer to purchase; they just would not be able to advertise those products using RGS's design

---

[3] BAP argues that RGS did not seek to purchase all the Insta-Snow products because RGS only offered to purchase all the "Insta-Snow 100 gram Jar" and "Insta-Snow 1 lb. Bag" products.  Second Brooks Decl. Ex. T.  RGS did not offer to purchase all the "Insta-Snow Powder Box" products or "36 pc Super Tube Display" products (which include a variety of different products, one of which is Insta-Snow) because it decided to discontinue selling them.  Third Brooks Decl. ¶ 12.

marks.  See Licensing Agreement ¶ 10 ("The parties agree that
all rights, title and interest granted by SSI to BAP under this
Agreement, including BAP's use of the SSI Trademarks, SSI
Patents and SSI Copyrights, will revert to SSI at the end of the
Agreement Term or upon termination of this Agreement whichever
occurs first.").  Although Defendants argue that they cannot
sell the products without using the design marks, Defendants can
sell the products by identifying them by their names and
descriptions.  It is not necessary for Defendants to display the
design marks prominently on their website or advertise that the
SSI products are "Brands of Be Amazing Toys."

The public interest also favors RGS and preventing further
consumer confusion, as "the public has an interest in not being
deceived — in being assured that the mark it associates with a
product is not attached to goods of unknown origin and quality."
New York City Triathlon, 704 F. Supp. 2d at 344.

Defendants argue that Creative Kids should not be enjoined
because it is merely a shareholder of BAP and does not sell the
products at issue.  However, Creative Kids is the majority
shareholder of BAP and has held itself out as affiliated with
BAP and as a seller of SSI products.  At the 2019 New York Toy
Fair, Creative Kids shared a booth with BAP that advertised and
sold SSI products and displayed a sign stating "The Creative
Kids and Be Amazing Team."  Second Brooks Decl. ¶ 140.  The

-23-

booth's Super Slime display included the logos of both Be Amazing and Creative Kids. Id. ¶ 139. BAP's website features the Creative Kids logo. Id. Exs. L, Q. Additionally, Creative Kids, not BAP, applied to register the "Instant Amazing Snow" design mark with the USPTO. Id. ¶¶ 141-142, Ex. V.

\*       \*       \*       \*       \*       \*       \*

[Portions of opinion immaterial to injunction omitted]

\*       \*       \*       \*       \*       \*       \*

## CONCLUSION AND PRELIMINARY INJUNCTION

Plaintiff's motion for a preliminary injunction (Dkt. No. 19) is granted in part, and Defendants are enjoined from selling the specific number of units of products that RGS sought to purchase at the expiration of the Licensing Agreement[4] and that bears any of the following marks: the "Insta-Snow" word mark,

---

[4] RGS sought to purchase 1002 units of Big Bag of Science (4120), 60 units of Real Science Real Fun (4165), 120 units of Test Tube Wonders (4415), 144 units of Test Tube Adventures (4420), 360 units of Soda Powered Science (4525), 120 units of Shocking Science (4530), 24 units of Super Slime Masterpiece (4860), 24 units of All Season Snowman (5885), 24 units of Super Slime PDO (12 pieces) (5889), 24 units of Super Slime Art (5910), 160 units of Fast Physics (6025), 240 units of Slick Tricks (6035), 194 units of Solve This (6040), 360 units of Sick Science Fizz Boom (6205), 480 units of Sick Science Snot Science (6215), 360 units of Super Size Sick Science (6610), 52,698 units of Geyser Tube Card (7130), 17,203 units of Geyser Tube with Caps (7155), 144 units of 36 pc Super Tube Display (7160), 11,053 units of Energy Stick (7250), 41,603 units of Insta-Snow 100 gram Jar (SNO-500), and 4,102 units of Insta-Snow 1 lb. Bag (SNO-650). Brooks Decl. Ex. T. (Dkt. No. 49-20).

"Insta-Snow" design mark, "Instant Amazing Snow" word mark, "Instant Amazing Snow" design mark, "Steve Spangler Science" word mark, "Steve Spangler Science" design mark, "Sick Science" word mark, "Sick Science" design mark, "Energy Stick" word mark, "Energy Stick" design mark, "Geyser Tube" word mark, and "Geyser Tube" design mark.

Defendants are also enjoined from manufacturing, distributing, selling, or offering for sale Instant Amazing Snow products and "stocking stuffer" Insta-Snow products.

Defendants are also enjoined from using any of the foregoing marks in advertising and promotional materials.  They may, however, list a product's name and description for their sales of products that are not enjoined.

Plaintiff shall post a bond in the amount of $600,000.

So ordered.

Dated:   New York, New York
         July 9, 2020

                              _Louis L. Stanton_
                              LOUIS L. STANTON
                              U.S.D.J.